UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| JEREMY VAUGHN PINSON, | Case No. 17-CV-3790 (PJS/SER) |
| Petitioner, | |
| v. | ORDER |
| WARDEN, FMC ROCHESTER, | |
| Respondent. | |

JaneAnne Murray, MURRAY LAW LLC, for petitioner.

Erin M. Secord, UNITED STATES ATTORNEY'S OFFICE, for respondent.

Jeremy Pinson is a federal prisoner who lost 109 days of good-time credit after a hearing officer found that she[1] was responsible for striking a guard and engaging in acts of self-mutilation. Pinson filed this habeas action under 28 U.S.C. § 2241 challenging her loss of good-time credit on the basis of various alleged due-process violations. The Court previously found that Pinson was not entitled to relief on most of her claims. But there was one claim—a claim that the hearing officer was biased—that the Court could not decide based on the record before it. The Court thus granted Pinson's request for an evidentiary hearing on that claim.

---

[1] Pinson is biologically a male and is classified as a male by the Bureau of Prisons. But Pinson identifies as a female, and uses female pronouns when referring to herself. The Court will do likewise.

Based on the evidence presented at that hearing, the Court now finds that Pinson's hearing officer was not biased and thus that Pinson was not denied due process. The Court therefore denies Pinson's § 2241 petition.

I. BACKGROUND

On back-to-back days in October 2016, Pinson was involved in two different incidents that eventually led to two different prison-disciplinary hearings. First, on October 2, Pinson engaged in acts of self-mutilation and struck a prison guard in the head with handcuffs. *See* ECF No. 1-1 at 2-5. Based on her conduct, the Bureau of Prisons ("BOP") charged Pinson with possession of a weapon, serious assault, and self-mutilation. *Id.* at 2; ECF No. 12-3 at 8, 12. Second, on the morning of October 3, after Pinson was taken to a local hospital for treatment of her self-mutilation injuries, she allegedly kicked and broke the bottom portion of a hospital bed, and she allegedly spat at and attempted to bite a prison official. The BOP charged Pinson with damaging property and minor assault. *See* Joint Ex. 26 at 00164-65; ECF No. 12-3 at 11-12.

Because of concerns about Pinson's mental health,[2] the BOP had Pinson evaluated before deciding whether to commence formal disciplinary proceedings against her. Specifically, the BOP had Pinson evaluated to determine (1) whether

---

[2]Pinson suffers from significant mental illness. In fact, because of Pinson's mental-health problems, she has been found not to be responsible for her conduct in 6 of the 82 prison-disciplinary proceedings in which she has been involved. ECF No. 12-5; ECF No. 12 at ¶ 9.

Pinson was competent to participate in the disciplinary proceedings and (2) whether Pinson could be found responsible for her conduct (i.e., whether, at the time of the incidents, she would have been able "to appreciate the nature and quality, or wrongfulness of the act[s]," ECF No. 12-2 at 5). ECF No. 12 at ¶ 17.

Pinson was evaluated by Dr. Randy Brandt, the Chief of Psychology at the United States Medical Center for Federal Prisoners in Springfield, Missouri. Dr. Brandt conducted two evaluations of Pinson and issued two reports—one relating to the prison incident on October 2 and the other relating to the hospital incident on October 3. The two reports indicate that Dr. Brandt took into account Pinson's mental-health history (including her alleged schizoaffective disorder) and all of the circumstances of the two incidents (including Pinson's alleged use of K2 and PCP on October 2). *See* ECF No. 13-2 at 10-12; ECF No. 14 at 3-5. Dr. Brandt concluded that Pinson was competent and responsible.

Based on Dr. Brandt's reports, the BOP decided to go forward with disciplinary proceedings against Pinson. Hearing officer Kevin Nikes was assigned to preside over both hearings. Pinson's first hearing was held on January 17, 2017, and it related to the October 3 hospital incident. *See* Joint Ex. 26 at 00164-65. Nikes was provided with Dr. Brandt's psychological evaluation finding Pinson competent and responsible (ECF No. 14 at 3-5), as well as with statements from various prison officials who claimed to

witness Pinson bite and spit at a prison staffer at the hospital (Joint Ex. 26 at 00131-46). Pinson also submitted her own evidence. Specifically, Pinson submitted a "clinical encounter" form that had been completed by her psychiatrist, Dr. Shawn Rice. In that form, Dr. Rice indicated that, at Pinson's request, he had prescribed medication "for agitation" in December 2016. Joint Ex. 26 at 00116-17. Pinson also submitted a personal statement in which she denied that she spat at or bit any member of the prison staff at the hospital, and in which she noted that "[t]he psychological assessment [i.e., Dr. Brandt's report, which found Pinson responsible for her conduct] is in conflict with the psychiatric assessment [i.e., Dr. Rice's "clinical encounter" form indicating that he had prescribed Pinson medication "for agitation"] which diagnoses me as schizoaffective." *Id.* at 00115, 00164. At the conclusion of the hearing, Nikes decided to expunge Pinson's October 3 incident report because of "conflicting evidence." *Id.* at 00165. In other words, Pinson prevailed.

About two weeks later, on January 31, 2017, Nikes held the second disciplinary hearing—this one related to the October 2 prison incident. *See* ECF No. 1-1 at 2-5. Once again, Nikes was provided with a psychological evaluation from Dr. Brandt finding Pinson competent and responsible, as well as with statements from various prison officials who witnessed the incident. *Id.* And once again, Pinson provided Nikes with her own evidence. Specifically, Pinson again submitted the December 2016

"clinical encounter" form from Dr. Rice, and Pinson also submitted a summary of her past mental-health diagnoses and prescribed medications. *Id.* at 3; *see also* Joint Ex. 13 at 00008-09, 00011, 00013, and 00015. In addition, Pinson submitted a personal statement about the incident, in which Pinson admitted to engaging in self-mutilation and striking a prison official in the head while flailing her arms. *See* ECF No. 1-1 at 2. But Pinson alleged that she was high on K2 and PCP at the time of the incident, and she noted that "Dr. Brandt disagrees with the psychiatrist['s] [Dr. Rice's] diagnosis [and] that is why he finds me responsible." *Id.*

At the conclusion of the hearing, Nikes found that Pinson had committed the charged acts and was responsible for her behavior. *Id.* at 2, 5. Two of the charged acts were 100-level violations—the most severe level of BOP violations. ECF No. 12-3 at 8. Nikes sanctioned Pinson by taking away 109 days of her good-time credit. ECF No. 1-1 at 5. Moreover, the two 100-level violations will have a significant (adverse) impact on Pinson's eligibility for lower-security housing. *See* ECF No. 69 at 115.

After exhausting her administrative remedies, Pinson filed this action under 28 U.S.C. § 2241 challenging her loss of good-time credit. *See* ECF No. 1.[3] Pinson's § 2241 petition contained a long list of alleged due-process violations. ECF No. 1-1 at 8, 10-12.

---

[3]Subsequent to the disciplinary proceeding at the Medical Center for Federal Prisoners in Springfield, Missouri, Pinson was transferred to the Federal Medical Center in Rochester, Minnesota, making this Court a proper venue for Pinson's § 2241 petition. *See United States v. Chappel*, 208 F.3d 1069, 1069 (8th Cir. 2000).

The Court dismissed most of Pinson's allegations as vague, conclusory, or contradicted by the record. *See* ECF No. 33 at 6-10. There was one allegation, however, that the Court could not decide based on the record before it: Pinson's allegation that Nikes was a biased decision maker.

Specifically, Pinson alleged in an affidavit that at her January 31, 2017 disciplinary hearing, Nikes told her that, although he personally believed that she was "clearly mentally ill," he "[couldn't] hold [her] not responsible on this one" because of pressure that he was receiving from "people above [his] pay grade." ECF No. 1-1 at p. 11, ¶ 15. Pinson also alleged that Nikes told her that, although he would accept any documentary evidence that she submitted, he would not consider that evidence in making his decision, as he had no choice but to find her responsible. *Id.* Finally, Pinson alleged that Nikes refused her request to call her psychiatrist (Dr. Rice) to testify, but instead merely accepted (but did not consider) documentary evidence regarding Dr. Rice's treatment of her. *Id.* In a responsive affidavit, Nikes denied making the comments attributed to him by Pinson, denied being pressured by anybody to hold Pinson responsible for the October 2 incident, and swore that he was "completely impartial and open-minded" at the January 31, 2017 hearing. *See* ECF No. 12 at ¶¶ 29-37.

The Court found that *if* Pinson's allegations were true, then Pinson was deprived of her constitutional right to an impartial decision maker. ECF No. 33 at 9. But the Court found that it could not resolve the direct conflict between Pinson's and Nikes's affidavits without an evidentiary hearing. *Id.* at 9-10. The Court thus ordered that an evidentiary hearing be held on the issue of Nikes's impartiality and appointed counsel to represent Pinson. The evidentiary hearing took place on April 17, 2019. Both Pinson and Nikes testified,[4] and, approximately two months later, both parties submitted post-hearing briefing. For the reasons that follow, the Court finds that Pinson did not carry her burden of establishing that Nikes was a biased hearing officer.

## II. ANALYSIS

Administrative hearing officers are entitled to "a presumption of honesty and integrity." *See Withrow v. Larkin*, 421 U.S. 35, 46-47 (1975). As the petitioner in this habeas proceeding, Pinson must overcome that presumption and prove, by a preponderance of the evidence, that Nikes was biased. *See, e.g.*, *Walker v. Johnston*, 312 U.S. 275, 286 (1941); *Word v. United States*, 604 F.2d 1127, 1130 (8th Cir. 1979).

At the evidentiary hearing, both parties devoted much of their attention to issues that have only a tangential relationship to the question of whether Nikes was biased.

---

[4]For whatever reason, neither party called Pinson's staff representative (Senior Officer Specialist Dickens), who was present during Pinson's entire disciplinary hearing, and thus presumably would know whether Nikes made the alleged statements.

Before discussing the evidence that was more directly related to that question, the Court will first explain why it does not find the indirect evidence to be particularly helpful.

*A. Indirect Evidence*

Pinson spent a great deal of time at the evidentiary hearing explaining why she disagrees with Nikes's decision that Pinson was responsible for her behavior on October 2. For example, Pinson argued that Nikes's reliance on Dr. Brandt's report to find her responsible "was wholly unreasonable." ECF No. 74 at 10.[5] The question before this Court is not, however, whether Nikes was *correct*, but whether Nikes was *biased*. Unbiased decision makers often make mistakes. Nikes's decision may have been incorrect, but it was not so obviously incorrect as to provide evidence that Nikes was biased.[6]

Pinson also testified that the punishments that Nikes imposed—taking away only the minimum amounts of good-time credit prescribed for these violations under

---

[5]The Court cites this document's internal pagination.

[6]Pinson argues that Nikes erred when he did not consider her *in*voluntary intoxication defense. *See* ECF No. 74 at 11. But, as the Court previously explained, there is no evidence that Nikes was ever told that Pinson was alleging involuntary intoxication. *See* ECF No. 33 at 5 n.4 (concluding that because Pinson "did not make [her involuntary-intoxication argument] before Nikes . . . she cannot make [it] now"). Indeed, Pinson herself conceded at the evidentiary hearing that she never told Nikes about the allegedly involuntary nature of her intoxication. *See* ECF No. 69 at 111-12. Obviously, Nikes did not show bias by failing to consider a defense that Pinson never raised.

BOP regulations, and not imposing any additional sanctions—were the lightest punishments she had ever received (or heard of anyone receiving) "for a 100 series incident report." ECF No. 69 at 113.[8] Pinson seemed to be implying that Nikes must have felt guilty about holding her responsible. But Nikes credibly explained that he determined the proper punishment for Pinson by first looking at BOP policy and choosing the "minimal amounts" of good-time credits that could be revoked for these infractions. *Id.* at 17. He then considered whether to impose additional sanctions, but decided not to do so, because "in certain instances," an additional sanction "like disciplinary segregation is actually not beneficial. It's harmful towards treatment." *Id.* Nikes concluded that, in Pinson's case, additional sanctions "would be counterproductive . . . ." *Id.* Nikes's conclusion finds support in Dr. Brandt's report, which did not recommend any additional sanctions for Pinson. *See* ECF No. 13-2 at 11. Under the circumstances, the Court does not find anything suspicious about the fact that Nikes showed leniency toward Pinson.

Pinson also complained at length about the fact that the BOP gave her access to the razor that she used to harm herself. *See, e.g.*, ECF No. 69 at 83-85; *see also id.* at 42-45;

---

[8]Pinson originally argued that the sanctions were not just lenient, but purely "academic"—having no impact at all on her sentence. *See, e.g.*, ECF No. 74 at 7, 13. When the Court inquired why, if that were true, the Court would have jurisdiction to rule on Pinson's § 2241 petition, both Pinson and the government clarified that the revocation of Pinson's good-time credit did indeed have an impact on her sentence. *See* ECF Nos. 80, 81, 83.

ECF No. 74 at 12-13. According to Pinson, she was placed in a cell in which there was a razor, even though she was not supposed to have unsupervised access to razors on account of her mental illness. Pinson's theory is that the BOP feared that it might be held civilly liable to Pinson, and thus the BOP charged her with—and ordered Nikes to hold her responsible for—various types of misconduct in connection with her October 2 self-mutilation. In that way, says Pinson, the BOP hoped to manufacture a defense under *Heck v. Humphrey*, 512 U.S. 477 (1994) to Pinson's anticipated lawsuit. *Heck* held that a plaintiff may not pursue a claim for damages "[when] a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." *Id.* at 486-87.

Assuming that the BOP staff who made the decision to charge Pinson had even heard of *Heck v. Humphrey*—a dubious assumption—the Court is not persuaded by Pinson's argument:

First, it is not clear that a civil action brought by Pinson would be barred by *Heck*, because it is not clear that a judgment in Pinson's favor would "necessarily imply the invalidity of" the revocation of Pinson's good-time credit. *Id.* at 487. Pinson was docked good-time credit because she was found to have (1) possessed a weapon (handcuffs), (2) assaulted an officer with that weapon, and (3) engaged in acts of self-

mutilation. ECF No. 1-1 at 5. Pinson is not specific about the civil lawsuit that the BOP is supposed to fear; presumably, that lawsuit would allege that the BOP failed to protect her when it gave her access to a razor. But the razor has nothing to do with two of the three violations. Moreover, a judgment by a court that the BOP was deliberately indifferent in *providing* a razor to Pinson is not necessarily inconsistent with a judgment by a hearing officer that Pinson violated prison rules in the way that she *used* that razor. Both could be true.[7] *See, e.g., Myles v. Chandler*, Case No: 15 C 2855, 2017 WL 4005924, at *3-4 (N.D. Ill. Sept. 12, 2017) (finding that, although the BOP concluded that the prisoner was guilty of fighting with another inmate, his failure-to-protect claim against the BOP based on him being placed near that inmate was not barred); *Gastile v. Virga*, No. 2:11-cv-02829 JAM EFB P, 2013 WL 3731733, at *3-5 (E.D. Cal. July 12, 2013), *R&R adopted at* 2013 WL 12184326 (E.D. Cal. Sept. 5, 2013) (same); *see also Head v. Ebert*, 6:14-CV-06546 EAW, 2019 WL 1316978, at *7-10 (W.D.N.Y. Mar. 22, 2019) (finding that, although the BOP concluded that the prisoner was guilty of assaulting an officer, his excessive-force claim against the officer was not barred); *Casey v. Brockley*, 9:13-cv-01271

---

[7]To illustrate the distinction: Suppose that a minor is convicted for drunk driving after he was involved in a car accident after being negligently served alcohol by a bar. If the minor later brought a civil action against the bar, a judgment against the bar would not "necessarily imply the invalidity" of the minor's drunk-driving conviction.

(DNH/TWD), 2018 WL 1399244, at *3-5 (N.D.N.Y. Feb. 16, 2018), *R&R adopted at* 2018 WL 1393787 (N.D.N.Y. Mar. 19, 2018) (same).[9]

Second, if barring a future lawsuit from Pinson was truly the BOP's concern, then the BOP almost surely would have based the weapon-possession charge on Pinson's possession of the *razor*, rather than on Pinson's possession of the *handcuffs*. A finding that Pinson violated prison rules by possessing a razor is harder to reconcile with a later finding that the BOP acted with deliberate indifference in providing that razor than is a finding that Pinson violated prison rules by using a razor to mutilate herself. *See, e.g.*, *Edouard v. Jones*, CASE NO. 17-CV-81318-ROSENBERG, 2018 U.S. Dist. LEXIS 27771, at *13-16 (S.D. Fla. Feb. 20, 2018) (finding that a prisoner who was found guilty of possessing a weapon was barred from bringing a claim against prison officials for allegedly planting the weapon on him), *R&R adopted at* 2018 U.S. Dist. LEXIS 39127 (S.D. Fla. Mar. 8, 2018); *Morrison v. Rochlin*, Case No. 5:17-cv-132-Oc-10PRL, 2017 WL 6558261, at *2-3 (M.D. Fla. Aug. 9, 2017) (same).

---

[9]It is possible that finding Pinson responsible for her conduct *does* preclude finding that the BOP failed to protect Pinson. The Court does not know enough about the BOP's "responsibility" standard, or Pinson's hypothetical civil lawsuit, to be able to say one way or the other. The Court's point is simply that a finding that the BOP acted with deliberate indifference in providing a razor to Pinson might not be inconsistent with a finding that Pinson was responsible for using the razor to engage in self-mutilation.

For these reasons, the Court does not believe that it is likely that the BOP pressured Nikes to find Pinson responsible because the BOP was hoping to manufacture a *Heck* defense to any future lawsuit brought by Pinson.

For its part, the government spent much of the hearing pointing out purported inconsistencies between the documents that Pinson submitted and the testimony that Pinson gave. But many of these purported inconsistencies were not actually inconsistent, and Pinson adequately explained the other purported inconsistencies.

Finally, the Court notes that both sides dedicated a lot of time to discussing the fact that Pinson is an extraordinarily litigious inmate. Clearly, Pinson does not like the BOP, and the BOP does not like Pinson, but that does not assist the Court in resolving the present dispute.

Having found the indirect evidence to be of little help, the Court now turns to the direct evidence.

### B. Direct Evidence

At the evidentiary hearing, both Pinson and Nikes testified consistently with their affidavits. Pinson testified that, at the January 31, 2017 disciplinary hearing, Nikes made various statements about being pressured by "people above [his] pay grade" to hold her responsible. Nikes testified that he never made any such statement or received any such pressure.

Both Nikes and Pinson appeared to be credible witnesses. Nothing in either witnesses' demeanor suggested that they were lying. Both were responsive to questions, both seemed to have good memories, and both appeared to be forthright. Both occasionally admitted that they did not know something, and both occasionally conceded that an unfavorable fact was true. For a number of reasons, however, the Court concludes that Nikes's version of events is more likely to be true than Pinson's:

First, Nikes and Pinson had no contact with each other prior to the first of the two disciplinary hearings. There is no reason to believe that Nikes had any kind of grudge against Pinson, or that the hearings were anything but routine for him.

Second, at the first hearing—about the hospital incident—Nikes *ruled in Pinson's favor* and expunged the incident report.[10] There may be bad blood between the BOP and Pinson, but there is no evidence of bad blood between Nikes and Pinson.

Third, Nikes testified credibly that he would have reported any improper pressure that he received. Nikes testified that in his nearly ten years as a disciplinary

---

[10]The Court notes that the weakest part of Nikes's testimony was his failure to explain why he expunged the report against Pinson relating to the hospital incident but not the report against Pinson relating to the prison incident. In his hearing report regarding the hospital incident, Nikes explained that "conflicting evidence" had caused him to expunge the report. Joint Ex. 26 at 00165. But resolving conflicting evidence is what hearing officers do; if evidence does not conflict, there is no reason for a hearing. Moreover, the evidence about the prison incident was about as "conflicting" as the evidence about the hospital incident. The Court still is not certain why Nikes expunged the hospital incident report or why he did not expunge the prison incident report for the same reason.

-14-

hearing officer—presiding over "a few thousand" hearings—he never received pressure to decide a case a particular way, with one exception. ECF No. 69 at 10. In that one instance, Nikes was told that the warden of a prison wanted two inmates found guilty, and Nikes was told what sanctions the warden wanted imposed. *Id.* Nikes reported the improper pressure to his supervisor, and then Nikes recused from the cases. *Id.* at 10-11. Nikes testified credibly that he would have acted in exactly the same way if he had received pressure regarding Pinson's case. *Id.* at 24.[11]

Fourth, Nikes had a long career as a disciplinary hearing officer, and the Court is aware of no evidence that he was ever accused of misconduct. To the contrary, the

---

[11]Pinson argues that there are two items of evidence in the record that show that Nikes received "pressure" from his superiors to find Pinson responsible. ECF No. 74 at 12.

First, an email chain from Nikes's boss to Nikes refers to Pinson's October 2 prison incident as "the one where [Pinson] struck Lieutenant Ramey." Joint Ex. 12 at 00026; ECF No. 69 at 61-63. Pinson argues that this email proves that Nikes's superiors had already determined that she was guilty and communicated that determination to Nikes. *See* ECF No. 74 at 12. The Court does not read the email in the same way. Instead, the Court reads the email as Nikes did—that is, as using shorthand to identify the particular incident at issue. *See* ECF No. 69 at 63. As the Court knows from experience, it is easy to leave the word "alleged" out of quick, informal communications about pending cases.

Second, Pinson points to "the multiple and redundant efforts to release Ms. Pinson's case" for administrative processing. ECF No. 74 at 12. The Court sees nothing nefarious about these multiple (and redundant) government forms releasing the case for administrative processing. *See* ECF No. 69 at 70-72. The most likely explanation for these redundant forms is bureaucratic error. As the Court also knows from experience, bureaucratic errors are common within the BOP.

evidence in the record suggests that Nikes was a competent, honest disciplinary hearing officer. Pinson, by contrast, has a record of lying to courts and bringing frivolous lawsuits[12]—and, of course, she suffers from severe mental illness. Pinson appeared to testify truthfully at the evidentiary hearing, but the Court cannot ignore her prior record.

Fifth, Nikes has no real incentive to lie about his conduct at this point. Nikes is now retired, and thus he is not at risk of losing his job if he admits that he made a mistake. By contrast, Pinson has an incentive to get the 100-level violations removed from her record, so that she may qualify for more comfortable housing. *See* ECF No. 69 at 115.

Finally, Pinson's version of events is inherently more difficult to believe than Nikes's. Pinson is asking this Court to believe that a man who was a disciplinary hearing officer for nearly a decade, who had an unblemished record, and who was intimately familiar with the rules governing disciplinary proceedings would put his career and reputation at risk by confessing to a prisoner who was notorious for her litigiousness and who was accompanied by her staff representative that he was about to violate her rights at the behest of BOP officials. Nothing about Nikes suggests that,

---

[12]*See, e.g.*, *Pinson v. Kasdon*, Civil Action No. 13-cv-01384-RM-BNB, 2014 U.S. Dist. LEXIS 60572 (D. Colo. Mar. 24, 2014) (recommending that Pinson be sanctioned for abusive litigation conduct and, in support of the recommendation, providing numerous examples of Pinson's "propensity to lie and to file copious, meritless motions").

even if he had been inclined to act unethically, he would have been stupid or ignorant enough to *admit* that fact to Pinson—and thereby to practically beg her to sue him.

For these reasons, the Court finds that Pinson has failed to meet her burden of proof.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT petitioner Jeremy Vaughn Pinson's application for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 [ECF No. 1] is DENIED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  September 24, 2019	s/Patrick J. Schiltz
	Patrick J. Schiltz
	United States District Judge